**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> LORENZO CATALAN-ROMAN (1) <br> HERNALDO MEDINA-VILLEGAS, <br><br> Defendant. | Crim. No. 02-117 (PG) |

**OPINION AND ORDER**

As a general matter, this Court frowns upon severance as an undue waste of judicial resources. See Zafiro v. U.S., 506 U.S. 534, 537-538(1993)("There is a preference in the federal system for joint trials of defendants who are indicted together."). See also Richardson v. Marsh, 481 U.S. 200, 209-210 (1987)(joint trials promote efficiency and "serve the interests of justice by avoiding inconsistent verdicts."). The Court, accordingly, denied two previous motions to sever.

However, on April 19, 2005, mid-penalty phase, the Court issued an oral order granting defendant Hernaldo Medina-Villegas' "Renewed Motion for Severance" on the grounds that the evolution of the evidence warranted sequential proceedings before the same jury in order to protect both defendants' 8th amendment right to an individualized sentence. (See Docket No. 466, Penalty Phase Trial Transcript, p. 53.) The Court now elaborates its reasoning.

**FACTUAL BACKGROUND**

On April 3, 2002, the Grand Jury returned an indictment of defendants Lorenzo Catalan-Roman ("Catalan") and Hernaldo Medina-Villegas ("Medina"), along with three other individuals, charging counts relating to conspiracy, carjacking, armed robbery, and the murder of a security guard during the commission of an armed robbery. (Docket No. 85.) The government certified

Cr. No. 02-117 (PG)                                                   Page 2

the case for prosecution as a death penalty case against defendants Catalan and Medina (Docket No. 149), and the Court severed the trial of the capital defendants from that of the non-capital defendants. (Docket No. 306.)

On December 16, 2004, the capital defendants filed a joint motion requesting a severance in the form of dual juries. (Docket No. 288.) The request was denied and one death-qualified jury was empaneled for both phases of the trial. (Docket No. 305.) Jury selection commenced in January and was completed on February 24, 2005.

On March 4, 2005, just three days before the trial was scheduled to commence, Catalan moved to exclude any evidence relating to his involvement in an attempted robbery that occurred on March 6, 2002, some three weeks prior to the incident which led to the capital charge. (Docket No. 345.) In the alternative, he renewed his request to sever his trial from Medina's because he intended to proffer Medina's exculpatory testimony as to his non-involvement in that attempted robbery. The Court denied his request for exclusion on the ground that he had failed to present any substantive argument warranting exclusion of that evidence. With regard to the request for severance, the Court found that Catalan had not met the Drougas standard[1].

Trial commenced on March 7, 2005 and lasted three weeks. On March 22, 2005, the jury found defendants guilty on all counts. (Docket Nos. 389 & 390.) The penalty phase proceedings began on April 12, 2005.

---

[1] To prevail on a motion for severance in order to secure the exculpatory testimony of a co-defendant, a defendant must prove: (1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant will in fact testify if the cases are severed. United States v. Drougas, 748 F.2d 8, 19 (1st Cir. 1984). If such a showing is made, a district court must (1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial damaging impeachment; (3) assess the counter arguments of judicial economy; and (4) give weight to the timeliness of the motion. Id. Here, Catalan's failed to adduce any evidence as to the substance of the testimony, its exculpatory effect and further failed to show that Medina would in fact testify. In addition, he made none of the second-tier showings. (Docket No. 354.)

After defendant Catalan had presented all of his mitigating information, specifically on April 19, 2005, Medina filed a sealed motion renewing his request for severance. (Docket No. 452.) Mr. Donald West, attorney for Medina, moved to argue the motion ex-parte, and the Court met with defense counsel ex-parte. Thereafter, in open court, the government presented oral arguments in opposition to the severance request.

Medina moved to sever his case from Catalan because he claimed that the jury had been irreparably and unfairly tainted against him due to the victim's brother's impact testimony, the government's change in narratives of how the crime took place, and Catalan's compelling mitigating evidence anent his character and background which Medina claimed he lacked[2]. Medina requested that the Court empanel a second jury for his sentencing phase or, in the alternative, hold sequential penalty hearings. The Court denied in part Medina's request to empanel a new death qualified jury, but granted sequential proceedings before the same jury.

## DISCUSSION

The death penalty is "unique in its severity and irrevocability." Gregg v. Georgia, 428 U.S. 153, 187 (1976) (internal citations omitted). Its finality therefore requires a greater degree of reliability when it is imposed. See Lockett v. Ohio 438 U.S. 586, 604 (1978); Furman v. Georgia, 408 U.S. 238, 290-98 (1972)(Brennan, J., concurring). Because there are no corrective or modifying mechanisms available with respect to an executed capital sentence, a capital defendant has an 8th amendment right to an individualized determination. See Lockett, 438 U.S., at 604-605. The Supreme Court has directed that "the fundamental respect for humanity underlying the Eighth Amendment, requires consideration of the character

---

[2] Medina argued that in the Court's January 26, 2005 order denying his first request for severance, it acknowledged that his contentions related solely to the penalty phase, concerns the Court would address "if and when the time comes". (Docket No. 305.) He submitted that the "time" had come. (Docket No. 452.)


and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976)(internal quotations omitted); see also Stringer v. Black, 503 U.S. 222, 230 (1992). Accordingly, the Court must instruct the jury on the need to give each defendant an "individualized determination." Zant v. Stephens, 462 U.S. 862, 879 (1983).

To achieve an individualized determination, the jury must have "all possible relevant information about the individual defendant whose fate it must determine." U.S. v. Fell, 360 F.3d 135, 143 (2nd Cir. 2004)(quoting Jurek v. Texas, 428 U.S. 262, 276 (1976)). See Woodson, 428 U.S. at 304. Thus, in keeping with the commands of the Eighth and Fourteenth Amendments that the death penalty should not be imposed without consideration of those factors which may call for a less severe penalty, the more information, the better. Id. at 605. This principle "is the product of a considerable history reflecting the law's effort to develop a system of capital punishment at once consistent ... but also humane and sensible to the uniqueness of the individual." Eddings v. Oklahoma, 455 U.S. 104, 110 (1982).

Section 3593(c) of the Federal Death Penalty Act ("FDPA") permits a defendant to bring before the jury any relevant information to sentencing, the aggravating factors alleged, and the mitigating factors in his or her favor. This is consonant with the Supreme Court's mandate that the jury have all possible relevant information before it when making its determination. See Fell, 360 F.3d at 144. The jury may consider information that shows that a defendant was a minor participant in the offense or that he or she did not have a significant prior history of other criminal conduct. Also, it may weigh any other factors such as the defendant's background, record, or character, as well as any circumstance of the offense that might mitigate against the imposition of the death sentence.

See 18 U.S.C. §3592(a)(3)(5)&(8).

### I. Severance

The care with which courts protect a capital defendant's constitutional right to an individualized determination, does not inevitably translate to automatic severance during capital sentencing proceedings. Special constitutional considerations present in capital cases, however, may require severance in situations that would not ordinarily do so in non-capital criminal cases. See also Gregg, 428 U.S. at 187 (holding that when a defendant's life is at stake, the Court must be particularly sensitive to insure that every safeguard is observed)(internal citations omitted)).

As a general matter, motions for severance under Rule 14 are ordinarily denied in light of the considerations elucidated by the Supreme Court in Zafiro v. U.S., 506 U.S. 534 (1993). Pursuant to Rule 14, jointly charged defendants may request severance of their trials if the "joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant." See Fed.R.Crim.P. 14. However, district courts grant such requests only where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro, 506 U.S. at 539. Rule 14 leaves the determination regarding the risk of prejudice and the tailoring of any relief to the sound discretion of the district court. Id. at 541.

Multi-defendant capital cases indeed give rise to a range of unfamiliar legal issues some of which favor severance even during the guilt phase. These considerations that favor of severance may become more acute in the sentencing phase in light of the constitutionally mandated fact-finding procedures necessary to impose the death penalty with a higher degree of reliability. The Eighth Amendment's requirement of an

Cr. No. 02-117 (PG)                                                    Page 6

individualized determination, a consideration not present in the guilt phase, demands a weighing of the defendant's character, background, mental and physical state, motivation, and precise role in the offense, among many other factors which are foreign to the jury's consideration on guilt. See McClesky v. Kemp, 481 U.S. 279, 294 (1987). The FDPA accordingly introduced a more relaxed standard of admissibility during the penalty phase, thereby promoting this individualized determination. Much of the information adduced during the penalty phase is thus beyond contemplation at the guilt phase. In addition, the lack of evidentiary standards and rules regarding parties' reciprocal disclosures often limit the Court's ability to predict conflicts and redress them appropriately during the penalty phase. The vast spectrum of complex issues the jury confronts throughout the sentencing phase also exacerbates the potential conflicts between defendants in a joint proceeding.

Nevertheless, not every allegation of risk of prejudice at sentencing warrants severance. See U.S. v. Tipton, 90 F.3d 861, 892 (4th Cir. 1996)(holding that in any multiple defendant case where each defendant had different applicable mitigating factors, risk of prejudice to right of individualized consideration would not be entirely removed by conducting sequential hearings before the same jury).

For a variety of reasons, the current weight of authority remains against severance of multiple defendants even in capital cases. In joint proceedings, a jury "may be able to arrive more reliably at its conclusions regarding the guilt or innocence of a particular defendant and to **assign fairly the respective responsibilities of each defendant in the sentencing.**" See id. (emphasis added). In addition, "underlying the [government's] interest in a joint trial is a related interest in promoting the reliability and consistency of [the] judicial process, given that the

Cr. No. 02-117 (PG)                                                      Page 7

jury obtains a more complete view of all the acts underlying the charges than would be possible in separate trials". Buchanan v. Kentucky, 483 U.S. 402, 418 (1987); see also U.S. v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993)("As a rule, persons who are indicted together should be tried together"); United States v. Villarreal, 963 F.2d 725 (5th Cir. 1992). This Court also finds that the same "considerations of efficiency and fairness to the Government (and possibly the accused as well) that militate in favor of joint trials of jointly-charged defendants in the guilt phase, ... must remain generally in play at the penalty phase." See Tipton, 90 F.3d at 892.

In keeping with the rule that severance should be the exception and not the norm, the FDPA in §3593(b) establishes that the sentencing hearing should be conducted before the jury that determined the defendant's guilt. See U.S. v. Green, Nos. 05-1014, 05-1151, 2005 WL 1119791 (1st Cir. May 12, 2005)(finding statute clearly intended to have one jury for both phases of the trial save for the statutory exceptions). Cf. U.S. v. Walker, 910 F. Supp 837 (N.D.N.Y 1995). A separate jury will be empaneled to determine defendant's sentence only if:

   (A)   the defendant was convicted upon a plea of guilty;
   (B)   the defendant was convicted after a trial before the court sitting without a jury;
   (C)   the jury that determined the defendant's guilt was discharged for good cause; or
   (D)   after initial imposition of a sentence under this section, reconsideration of the sentence under this section is necessary.

18 U.S.C.A. § 3593(b)[3]. Thus, the statute's language disapproves that variation on severance which would result in empaneling two juries. As the Court concluded in Walker, a careful voir dire process and cautionary

---

[3] The hearing can also be held "before the court alone, upon the motion of the defendant and with the approval of the attorney for the government." 18 U.S.C. § 3593(b)(3).

Cr. No. 02-117 (PG)                                                   Page 8

curative instructions will generally remedy any possible prejudice to the defendants. See U.S. v. Taylor, 293 F.Supp. 2d 884, 889 (N.D. Ind. 2003)(same jury empaneled for both phases because juries are able to follow limiting instructions and give separate consideration to each defendant as constitutionally required). Proper jury instructions provide guidance and reduce the likelihood that the death sentence will be imposed in an erratic, freakish, biased or inequitable manner. Gregg, 428 U.S., at 189-190("[A]ccurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision."). "It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." Id. at 193. Indeed, Courts who have faced the issue have found that jury instructions will suffice to cure any prejudice to defendants' rights. See Tipton, 90 F.3d at 892 (risk of prejudice reduced to constitutionally tolerable level because the jury was frequently instructed on the need to give each defendant an individualized consideration); U.S. v. Rivera, No. Crim.A 04-283, 2005 WL 743091, at *6 (E.D.Va. March 24, 2005)(denying pre-trial severance request and holding that "threat posed to individualized consideration will best be addressed by a joint penalty phase governed by the Court's limiting instructions"); Taylor, 293 F.Supp. 2d at 889 (same jury empaneled for both phases because juries are able to follow limiting instructions and give separate consideration to each defendant as constitutionally required).

Therefore, under the FDPA an individualized determination is achievable even when proceeding jointly as there are several mechanisms available, such as jury instructions, to safeguard defendant's rights. There are cases, however, in which the combined effect of proper instructions or limited witness examination will not suffice to cure the

Cr. No. 02-117 (PG)                                                      Page 9

risk of prejudice to defendant's rights. If the Court in its discretion finds that there is indeed a high risk of incurable prejudice, it will be more inclined to determine that some form of severance is in fact warranted.

Here, Medina argued that these safeguards were not enough because the jury had been irreparably and unfairly tainted against him by the victim's brother's impact testimony, the government's change in narratives, and Catalan's compelling character mitigating information. He therefore moved to sever his case from Catalan's.

The Court first addresses Medina's arguments for empaneling a new jury, request that was denied.  Secondly, we address why proceeding with sequential penalty hearings was the appropriate choice to safeguard his Eighth Amendment right to an individualized determination.

**A.  Empaneling a new jury**

As discussed above, the FDPA in §3593(b) establishes that the sentencing hearing should be conducted before the jury that determined the defendant's guilt and only in a few numbered exceptions should another jury be empaneled. See 18 U.S.C.A. § 3593(b). Medina's case did not fall under any of the statutory exceptions. He did not plead guilty; his guilt-phase trial was not a bench trial; his liability jury was not discharged for good cause; and his sentence was not under reconsideration. Therefore, in accordance with the statute's language, the same jury that determined his guilt should be the same jury that determined his sentence. See Green, 2005 WL 1119791[4] (holding that §3593(b)(2) requires that the jury that determines

---

[4] Medina argued that empaneling a new jury was warranted for the same reasons and constitutional infirmities that were identified and discussed in the case of U.S. v. Green, 324 F.Supp.2d 311(D. Mass. July 7, 2004).  In Green, the court granted capital defendants' pre-trial motion for severance to empanel a non-death qualified jury to determine guilt and a death-qualified jury for sentencing on the ground that §3593 did not mandate a unitary jury, as well as to avoid prejudice due to blame shifting and dilution. Before ruling on Medina's motion, this Court

Cr. No. 02-117 (PG)                                                   Page 10

guilt also determine the penalty unless one of the four statutory exceptions applies).

Medina claimed, however, that the jury had been irreparably tainted by the victim's brother testimony to the effect that he now believed in the death penalty because the victim was shot while pleading for his life.

During the victim's brother's cross-examination, Catalan's counsel asked him whether it was true that a big part of his emotional problems was due to the fact that he and his family did not believe in the death penalty. (Docket No. 433 at 52.) The witness didn't specifically answer. (Id.) Catalan's counsel inquired whether he recalled a visit by a defense investigator who interviewed the family and to whom they related not believing in the death penalty.  The witness answered yes. (Id. at 53.) In redirect examination, the government asked whether the need for justice with regards to the two men that killed his brother had led him to change his views about the need for the death penalty in certain cases, to which the witness answered yes. (Id. at 54.) When the government inquired why he had changed his views, the witness asked permission to stand, raised his hands and said "no, no, please no" making reference to Eluber Torres-Alejandro's testimony of how the victim pleaded for his life while being shot.(Id.)

Mr. West argued, at sidebar[5] that this was particularly damaging to

---

reviewed the Green case and found its rationale non-dispositive of the issue presented here. At the time, the Court did not have the benefit of the First Circuit Court of Appeals decision reversing Green and holding that §3593(b)(2) requires that the jury that determines guilt also determine the penalty unless one of the four statutory exceptions pertains. See id., 2005 WL 1119791 (1st Cir. May 12, 2005). In any case, Green was a pre-trial ruling while here, the issue was raised mid-penalty phase as a result of an alleged improper tainting of the jury by the victim's brother impact testimony and because Medina lacked character mitigating information as compelling as Catalan's.

[5] Medina's counsel did not object to Catalan's questioning regarding the brother's views on the death penalty. He only objected when the government proceeded to ask the brother whether the victim had his trial the day of the

his client because the facts proved at trial showed it was Medina and not Catalan who shot Mr. Rodriguez-Cabrera while he pled for his life. Mr. West further adduced that the way the witness had answered had been directed at his client and having the jury heard the brother's reason for supporting the death penalty, made it impossible for Medina to get a fair trial in sentencing. He therefore moved for a mistrial pursuant to Booth[6] and Payne[7]. (Id. at 58.)

First of all, it was Catalan's counsel who elicited the witness' opinions about the death penalty and not the government. (Id. at 59.) When the question was made, Mr. West did not object and neither did he object to the government's redirect examination on the matter. In fact, the witness took a while to answer and Mr. West never raised any objections. His request for a mistrial was thus untimely and more so given that he had made no effort to mitigate the risk of prejudice. Furthermore, the facts to which the witness alluded, i.e--that the victim was shot while pleading for his life-- were facts the jury had knowledge of, and while prejudicial to Medina, did not form the basis for a mistrial or empaneling of a new jury. (Id. at 60.)

---

murder. Mr. West objected and argued at sidebar it was improper for the government to imply to the jury that the morning the victim was killed, he had his trial and defendants were his judge, jury and executioner. (Id. at 55.) The government retorted that defendants had opened the door to the line of questioning as they had tried to use the witness' opinion to send a message to the jury that the death penalty was an inappropriate sentencing alternative in this case. Catalan's counsel clarified that his line of questions was in response to the government's repeated questions about the witness' emotional state and that of his family. (Id.) He further stated that from their pre-trial investigation, they had information that a big part of the victim's family emotional trauma was based on the fact that they are opposed to the death penalty, that they advised the government they did not want the death penalty, and that the government was seeking it over their objection. (Id. at 55-56.) The government disagreed with Catalan's counsel's contentions but decided that it had properly rebutted his line of questioning and withdrew the final question regarding the victim's trial at the crime scene.

[6] Booth v. Maryland, 482 U.S. 496 (1987).

[7] Payne v. Tennessee, 501 U.S. 808 (1991).

The government's direct and redirect examination was distinguishable from Booth and Payne inasmuch as the matter of the emotional distress, as expressed in the impact statement, did not aid to measure how much of that grief was attributable to the victim's death or to the fact that the family, due to their religious beliefs, did not believe in the death penalty. (See Docket No. 433 at 65-66). These were not the concerns present in Booth and Payne.

Ultimately, the statute's language, the reviewed case law, as well as the particular circumstances of the case, all weighed in favor of continuing the proceedings before the same jury and avoiding unnecessary delays. Furthermore, the Court would continue to give the jury instructions as to the need to give each defendant individualized consideration. See Tipton, 90 F.3d at 892; Rivera, 2005 WL 743091, at *6; Taylor, 293 F.Supp. 2d at 889; Walker, 910 F. Supp 837 at 857.

At the commencement of defendants' penalty phase hearing, the Court instructed the jury that they had to keep in mind that each juror must give separate consideration to the evidence concerning each individual defendant. The Court stated: "Each defendant is entitled to be treated separately, and you must return a separate verdict for each defendant." (Docket No. 433 at 14, Trial Transcript, April 12, 2005). This is precisely the type of instruction that safeguards a defendant's Eight Amendment right to an individualized determination. Moreover, this jury had knowledge of all the evidence that was presented during the guilt phase; thus would be more capable of making an individualized and well-founded determination inasmuch as it had "before it all possible relevant information about the individual defendant whose fate it [would] determine." Fell, 360 F.3d at 143.

In sum, the statute favors a unitary jury, and here, the interests of

Cr. No. 02-117 (PG)                                                    Page 13

justice did not require empaneling a new one.

### B. Sequential penalty hearings.

In the alternative, Medina moved for severance in the form of sequential penalty hearings. The court had earlier denied defendant's pre-trial motion for severance, finding that it could not discern whether blame-shifting or spillover issues would materialize. At the time of Medina's mid-penalty phase request, however, the Court was in a position to make that determination and decide what if any remedy was appropriate in light of the circumstances of the case. Among the alternatives the Court mentioned in its pre-trial ruling that were available in the event of prejudice was proceeding with sequential penalty hearings before the same jury. (Docket No. 305.) Some courts who have faced these issues have decided to proceed jointly. See U.S. v. Gooding, Nos. 94-5405, 94-5406, 94-5407, 94-5408, 94-5409, 94-5410, 94-5444, 94-5445, 94-5448, 1995 WL 538690, at *1 (4th Cir. Sept. 11, 1995)(unpublished opinion)(capital defendants and non-capital defendants were tried together, joint penalty phase hearings for both capital defendants, all before the same jury); Tipton, 90 F.3d 861 (joint penalty phase hearings); U.S. v. Beckford, Nos. 97-4924, 97-2925, 97-4926, 97-4927, 2000 WL 3761455, at *4 (4th Cir. May 3, 2000)(joint trials and joint sentencing hearings); Villarreal, 963 F.2d 725 (joint sentencing hearings); U.S. v. Kevin Gray, 92 F.Supp. 2d 71(D.D.C. 2003)(joint sentencing hearings).

Other courts, however, have decided to hold sequential penalty hearings. See U.S. v. Ortiz, 315 F.3d 873 (8th Cir. 2003)(joint trials, sequential penalty hearings); U.S. v. Peoples, 250 F.3d 630 (8 th Cir. 2001)(joint trial, sequential penalty hearings); U.S. v. Lee, 274 F.3d 485, 488 (8th Cir. 2001)(joint trials, sequential penalty hearings before the same jury); U.S. v. McCullah, 76 F.3d 1087, 1097 (10th Cir. 1996)(joint

trails, sequential penalty hearings before the same jury that determined guilt); Taylor, 293 F.Supp. 2d at 889-900(joint trial, sequential penalty hearings); U.S. v. Usama Bin Laden, 156 F.Supp. 2d 359 (S.D.N.Y. 2001)(sequential sentencing hearings for defendants Al-Owhali and Mohamed); U.S. v. Davis, 904 F.Supp. 554 (E.D. La. 1995)(sequential sentencing hearings), *on appeal*, U.S. v. Causey, 185 F.3d 407 (5th Cir. 1999).

In Taylor, the Court held that although the same jury that determined defendant's guilt should also determine his sentence, the benefits of consecutive sentencing hearings before the same jury outweighed any other consideration including the costs of holding several hearings. Id., 293 F.Supp. 2d at 889-900. Particularly, the Court understood that because co-defendant's counsel would not participate in sequential hearings, the chance that he would turn into co-defendant's prosecutor or that the co-defendant would be faced with evidence of which he did not know of would be minimized. Id. at 900. Furthermore, that consecutive hearings would not be extremely repetitive because the jury would likely have already heard in the guilt phase much of the information in support of the aggravating factors alleged, thus the "additional evidence required to prove these factors at the penalty phase [was] likely to be minimal." Id. There, aside from the mitigating information, the only new information pertained to an aggravating factor applicable only to one of the defendants. The Court found that holding sequential hearings was a "small price to pay in order to further ensure individualized consideration by the jury of each defendant's punishment."

Here, Mr. West argued that the circumstances of the case had substantially changed due to the government's switch in narratives of how Mr. Rodriguez-Cabrera was shot, information he claimed they found out during the government's opening statement at trial. Mr. West claimed that

Cr. No. 02-117 (PG)                                                                  Page 15

Mr. Potolsky, Catalan's counsel, could attempt to mitigate his client's role by adopting the government's theory of the case which was more damaging to Medina. The change in narratives, he stated, absolutely devastated Medina and forced him to be at odds with Catalan's counsel because he would have to show that Catalan was more culpable than the government had been able to show. Specifically, he pointed out that one irreconcilable problem would be if he wanted to offer Catalan's statement into evidence[8].

Blame-shifting is one of the many concerns of joint proceedings yet not every instance of "finger-pointing" requires severance. When there is a real risk that one co-defendant will become the other's prosecutor, the Court should favorably consider proceeding separately. Here, the government's version of the facts favored one defendant more than the other. The affected defendant claimed he would bring information to cast doubt as to the government's version of the facts and to do that he would be in effect showing the jury how more culpable his co-defendant was. This situation, however, is germane in any type of joint proceeding. Nevertheless, the jury could be put in a position to balance one defendant of the other with regards to their culpability and participation in the

---

[8] To that effect, Mr. Potolsky argued that if he were to close in a severed proceeding he would not be pointing a finger at Medina. However, in a joint proceedings, if Medina brought affirmative evidence harmful to Catalan, he would have to do that and that's where the "free-for-all" would start and the integrity of the proceedings as to both defendants would become an issue. He pointed out that he shared many concerns with Mr. West regarding the continuance of the joint penalty phase because he sensed that what would happen is that every witness Medina called would require a sidebar to discuss the parameters of the testimony and what it would implicate for Catalan because he had decided to opt out of that witness. As an example, he mentioned that Mr. West would like to call an officer who arrived on the scene who would present testimony that Eluber Torres-Alejandro told him that he shot the person who had been standing over his partner who was on the ground shooting him. He argues it would create an image in the jury's mind that he would have to respond to. Furthermore, that he disagreed with Mr. West's strategy as to their ballistics expert testimony who he did not intend to call as a witness yet Mr. West insisted on calling. In sum, he anticipated that other than character witnesses, they would do battle over every witness.

crime. In such a scenario, the government, who has the burden of proving the existence of aggravating factors, could sit back and let each defendant prosecute each other. These considerations weigh heavily in favor of defendant's alternate request to proceed with sequential penalty hearings[9], even though, jury instructions could still aid to cure such prejudice.

Lastly, during the *ex-parte in camera* hearing, Mr. West stressed the high risk of dilution of Medina's mitigating information in light of Catalan's very powerful mitigation regarding his good behavior before and after he was arrested. Because of Medina's lack of commensurate mitigation, Mr. West claimed that continuing with a joint penalty trial would overshadow Medina's right to an individualized determination because the jury would be unable to forego comparing the two defendants.

The information Catalan presented in support of his character mitigation was indeed potent. The Court recalls, for example, the testimony of several members of Catalan's former church who spoke about his involvement in church, his witnessing of his beliefs, and most significantly, that he had once talked a man out of committing suicide. One member spoke about how he gave all of his clothes away to some needy children during a trip to the Dominican Republic. There was also the very compelling testimony of Charlie O'Neill-Martinez, a fifteen-year-old, who testified in tears that Catalan was the one who taught him to play basketball, advised him to stay in school, off the streets, and work hard

---

[9] Indeed, in his closing arguments, Mr. Potolsky made a statement regarding the vulnerable victim aggravating factor to the effect that the victim was not vulnerable when he was shot by Catalan but by Medina as he had his hands raised up and pleaded for his life. Furthermore, during Medina's sentencing hearings, Mr. West brought evidence to counter the government's evidence in its guilt case-in-chief with regards to the foresensic and ballistics evidence as well as a statement made by Catalan in which he took the blame for the first shot fired. In all fairness, Medina's penalty phase hearing focused more on the facts of the case and how the alleged loopholes in the government's version of the events showed that possibly Catalan was more culpable than Medina. This bolsters our conclusion that the proper thing to do was to proceed with sequential penalty hearings.

Cr. No. 02-117 (PG)                                                      Page 17

to achieve his life goals. He further testified that the one person, other that his mother, to whom he was thankful for who he is today, was Catalan. Lastly, he testified that it meant a lot to him, while growing up, to have Catalan tell him these things because his real father was in jail and Catalan had been like a father or an uncle to him. While Charlie testified, he, the defendant, and several jurors sobbed.

Other testimony offered by Catalan also had a similar effect. Catalan's niece, crying as well, read a letter he had sent her from jail for her birthday. While she read the letter, defendant cried and several jurors were visibly affected. Finally, his former ex-domestic partner testified in tears how Catalan had treated her son as his own and that when she became pregnant with their child, he convinced her not to have an abortion. She concluded by telling the jury about the children's continued relationship with Catalan and the importance of their visits with him at the Metropolitan Detention Center ("MDC"). Beyond question, the testimony was powerful.

Catalan also offered information regarding his religious activities within the MDC. He brought Juan Cintron, the MDC chaplain, who testified that Catalan regularly attended his unit's weekly worship services and was always willing to learn more about the Bible, pray, and strengthen his faith. He stated that Catalan was always respectful, helped other inmates in times of distress, prayed with them, and offered them his help and advice. He further testified that of the 1,000 inmates at the MDC, Catalan stood out as one of the 3 or 4 who were a positive influence on other inmates. (Docket No. 450 at 51-55). Another witness who testified about Catalan's religious witnessing at MDC was correctional officer Jorge Luis Montero Valle. He attested having observed Catalan attending the religious services and speaking with others about religion. He stated that he also

Cr. No. 02-117 (PG)                                                     Page 18

had conversed about religion with Catalan, whose knowledge of the subject was greater that his own. He further testified that Catalan was always willing to work, that each and every time he was asked to do something he would do it, and that he was a positive influence on other inmates. (Docket No. 450 at 60-63.)

If Medina lacked pre- and post-arrest character and background mitigating information as powerful as Catalan's, he would undoubtedly be at a comparative disadvantage before the jury. There was a high risk that the jury could set up a comparison of how strong Catalan's impact was on others, particularly children, versus how strong Medina's impact was. Furthermore, the information that was provided in support of a decision on the side of life for Catalan, could in fact translate into aggravating information vis-a-vis Medina, undermining whatever mitigating information he brought, thereby transgressing his constitutional rights. These considerations tilted the balance in favor of holding consecutive penalty phase hearings.

Here, the situation was even more potentially prejudicial considering that lack of remorse was an aggravator only as to Medina, and at trial, the evidence presented showed that while detained at the MDC, he had boasted about his sharpshooting skills and how if he went to trial, he was sure to win. Specifically, Miguel Alamo, Medina's cell mate at the MDC, testified that Medina had told him that his nickname was "Ranger" because he had shot the Ranger American guard and that he had used the money from the robbery to buy a car, rims, music equipment, jewelry, and new furniture for his home. Additionally, that on one occasion, after watching a movie at the MDC, Medina had boasted of, as the movie depicted, how good a sharpshooter he was. (Docket No. 371 at 98-99).

Although lack of remorse was not an aggravator as to Catalan, his

evidence regarding his religiousness could have been viewed as self-reproach in contrast to the strong evidence against Medina regarding his actions that indicate a lack of remorse. In other words, the jury could have inferred that if Medina did not bring evidence of his religious beliefs or participation in religious activities during his pre-trial detention at the MDC it was because he lacked such information. The jury could possibly balance one defendant against the other and decide which of the two was worse and deserved the harshest penalty. This is constitutionally unacceptable in a death penalty sentencing proceeding. The Court thus found that to avoid such risks, severance in the form of sequential penalty hearings was the adequate choice to safeguard defendants' right to an individualized determination.

## CONCLUSION

As evinced by the preceding discussion, the Court considered Catalan's mitigation information, the parties' arguments, and the applicable case law. Indeed, there was a high risk that Medina would have been placed in a comparative disadvantage before the jury. Joint proceedings would have affected Medina's right to an unencumbered evaluation of the gravity of his crime, his participation, and his own moral culpability. The risk that the "loser" in the jury's final equation received a death sentence while the other was spared, was unacceptable. Therefore, the Court concluded that to safeguard the integrity of the proceedings as to both defendants, sequential penalty phase hearings were warranted.

**IT IS SO ORDERED**

In San Juan, Puerto Rico, June 7, 2005.

                                        S/JUAN M. PEREZ-GIMENEZ
                                        U.S. District Judge